**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SPRINTRAY, INC., Plaintiff, vs. ASIGA PTY LTD., and ASIGA AMERICA, INC., Defendants. | ) ) ) ) ) ) ) ) ) ) | C.A. No. ______________ **JURY TRIAL DEMANDED** |

# COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SprintRay, Inc. ("Plaintiff" or "SprintRay") files this Complaint for Patent Infringement and Demand for Jury Trial against Asiga Pty Ltd. and Asiga America, Inc. (collectively, "Defendants" or "Asiga") and alleges as follows:

1. SprintRay developed and patented novel technology for advanced, high-quality 3D printing. The United States Patent and Trademark Office ("USPTO") awarded SprintRay U.S. Patent Nos. 8,110,135, 8,815,143, 8,845,316, 8,862,260, 10,894,355, 11,679,555, 12,576,588, and 12,583,180. Exs. 1-8 (the "Asserted Patents"). SprintRay filed this suit to protect its valuable intellectual property from Asiga's ongoing infringement.

## THE PARTIES

2. SprintRay is a California corporation with its principal place of business at 2710 Media Center Drive, Suite 100A, Los Angeles, CA 90065.

3. Asiga Pty Ltd. ("Asiga Pty") is a corporation organized and existing under the laws of Australia, with its principal place of business located at 2 / 19-21 Bourke Road, Alexandria 2015, New South Wales, Australia. Asiga Pty designs and manufactures precision stereolithography ("SLA") and digital light processing ("DLP") 3D printers, related hardware

components, materials, and software. Asiga Pty markets and offers these products for sale in the United States through its website and through authorized resellers and distributors and introduces these products into the stream of commerce with the knowledge and expectation that they will be sold in this District and throughout the United States.

4. Asiga America, Inc. ("Asiga America") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1350 Highland Drive, Suite F, Ann Arbor, Michigan 48108. Upon information and belief, Asiga America imports, distributes, markets, and sells Asiga Pty's 3D printers and related products throughout the United States, introducing them into the stream of commerce knowing that they would be sold in this District and elsewhere in the United States.

5. On information and belief, Defendants Asiga Pty and Asiga America are related entities that work in concert to design, manufacture, import, distribute, and offer for sale the infringing products.

## JURISDICTION AND VENUE

6. This action for patent infringement arises under the patent laws of the United States, 35 U.S.C. § 101 *et seq.* This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1338 because this is a civil action arising under the Patent Act.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1400(b). Venue is proper as to Asiga America, Inc. under 28 U.S.C. § 1400(b) because Asiga America resides in this District, having been incorporated under the laws of the State of Delaware, and because it has committed acts of infringement in this District.

8. Venue is proper as to Asiga Pty, a foreign corporation, because suits against foreign entities are proper in any judicial district under 28 U.S.C. § 1391(c)(3).

9. Asiga Pty is subject to this Court's personal jurisdiction consistent with the principles of due process and the Delaware Long-Arm Statute, including for the reasons set forth below. 10 Del. C. § 3104.

10. This Court has personal jurisdiction over Asiga America because it is incorporated within this District.

11. This Court further has personal jurisdiction over Defendants because Defendants regularly and continuously, either directly or through subsidiaries or intermediaries, conduct business in this District and have infringed, and continue to do so, in this District. In addition, the Court has personal jurisdiction over Defendants because they have established minimum contacts with this District and the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. For example, Defendants maintain a United States office in Ann Arbor, Michigan and market and sell products alleged to be infringing in this Complaint throughout the United States, including in this District, through their website and network of authorized resellers and distributors, as identified further below. On information and belief, Defendants have derived substantial revenues from their infringing acts occurring in this District and throughout the United States.

## SPRINTRAY'S ASSERTED PATENTS

12. SprintRay was founded in 2014. SprintRay builds and supplies end-to-end 3D printing products and ecosystems, including to dental professionals, using technologies that are both cutting-edge and user-friendly. SprintRay offers a range of 3D printing solutions, including its SprintRay Pro 55S, Pro 95S and Pro 2 3D printers. Based on SprintRay's research and development, SprintRay was awarded a number of patents for its novel technological advances.

13. On February 7, 2012, the USPTO issued U.S. Patent No. 8,110,135 (the "'135 Patent"), entitled "Process and Freeform Fabrication System for Producing Three-Dimensional Object." The '135 Patent lists Ali El-Siblani as its inventor. Attached hereto as Exhibit 1 is a true and correct copy of the '135 Patent.

14. All rights, title, and interest in the '135 Patent have been assigned to SprintRay, which is the sole owner of the '135 Patent.

15. On August 26, 2014, the USPTO issued U.S. Patent No. 8,815,143 (the "'143 Patent"), entitled "Method for Producing A Three-Dimensional Object By Means of Mask Exposure." The '143 Patent lists John Hendrik, Ali El-Siblani, and Volker Schillen as its inventors. Attached hereto as Exhibit 2 is a true and correct copy of the '143 Patent.

16. All rights, title, and interest in the '143 Patent have been assigned to SprintRay, which is the sole owner of the '143 Patent.

17. On September 30, 2014, the USPTO issued U.S. Patent No. 8,845,316 (the "'316 Patent"), entitled "Process and Device for Producing a Three-Dimensional Object." The '316 Patent lists Volker Schillen and Ali El-Siblani as its inventors. Attached hereto as Exhibit 3 is a true and correct copy of the '316 Patent.

18. All rights, title, and interest in the '316 Patent have been assigned to SprintRay, which is the sole owner of the '316 Patent.

19. On October 14, 2014, the USPTO issued U.S. Patent No. 8,862,260, entitled "Process for the Production of a Three-Dimensional Object with Resolution Improvement by 'Pixel-Shift'" (the "'260 Patent"). The '260 Patent lists Alexandr Shkolnik, Hendrik John, and Ali El-Siblani as its inventors. Attached hereto as Exhibit 4 is a true and correct copy of the '260 Patent.

20. All rights, title, and interest in the ’260 Patent have been assigned to SprintRay, which is the sole owner of the ’260 Patent.

21. On January 19, 2021, the USPTO issued U.S. Patent No. 10,894,355 (the “’355 Patent”), entitled “Resin Solidification Substrate and Assembly.” The ’355 Patent lists Ali El-Siblani and Alexandr Shkolnik as its inventors. Attached hereto as Exhibit 5 is a true and correct copy of the ’355 Patent.

22. All rights, title, and interest in the ’355 Patent have been assigned to SprintRay, which is the sole owner of the ’355 Patent.

23. On June 20, 2023, the USPTO issued U.S. Patent No. 11,679,555 (the “’555 Patent”), entitled “Reservoir with Substrate and Assembly for Reducing Separation Forces in Three-Dimensional Printing.” The ’555 Patent lists Amir Mansouri, Huijian Tian, Hossein Bassir, Jing Zhang, and Shukun Ye as its inventors. Attached hereto as Exhibit 6 is a true and correct copy of the ’555 Patent.

24. All rights, title, and interest in the ’555 Patent have been assigned to SprintRay, which is the sole owner of the ’555 Patent.

25. On March 17, 2026, the USPTO issued U.S. Patent No. 12,576,588 (the “’588 Patent”), entitled “Reservoir with Substrate Assembly for Reducing Separation Forces in Three-Dimensional Printing.” The ’588 Patent lists Amir Mansouri, Huijian Tian, Hossein Bassir, Jing Zhang, and Shukun Ye as its inventors. Attached hereto as Exhibit 7 is a true and correct copy of the ’588 Patent.

26. All rights, title, and interest in the ’588 Patent have been assigned to SprintRay, which is the sole owner of the ’588 Patent.

27. On March 24, 2026, the USPTO issued U.S. Patent No. 12,583,180 (the "'180 Patent"), entitled "Reservoir Assembly for Enhancing a Surface Finish of a 3D-Printed Object." The '180 Patent lists Amir Mansouri, Huijian Tian, Hossein Bassir, Jing Zhang, and Shukun Ye as its inventors. Attached hereto as Exhibit 8 is a true and correct copy of the '180 Patent.

28. All rights, title, and interest in the '180 Patent have been assigned to SprintRay, which is the sole owner of the '180 Patent.

29. SprintRay complies with 35 U.S.C. § 287 by marking its patent-practicing 3D printers with a link to its website that provides a list of the patents that each printer practices. Ex. 9 (https://sprintray.com/patents/). SprintRay has marked its patent-practicing products in a substantially consistent and continuous manner. To the extent any Asserted Patent includes apparatus or system claims embodied in a tangible article capable of being marked, SprintRay has marked in accordance with Section 287. SprintRay is informed and believes that Asiga is aware of SprintRay's Asserted Patents, as Asiga told SprintRay that it was "very familiar" with patents in its portfolio. At a minimum, the filing and service of this Complaint constitute notice under 35 U.S.C. § 287(a).

## ASIGA'S INFRINGING PRODUCTS

30. Asiga makes, uses, offers for sale, sells and imports products that infringe one or more claims of the Asserted Patents.

31. For example, Asiga's Ultra 3D Printers ("Ultra"), available as the Ultra (32) and Ultra (50), infringe the Asserted Patents as set forth below. Ex. 10, (https://myaccount.asiga.com/media/public/2025/Asiga-Ultra-usen.pdf), Ex. 11 (https://www.asiga.com/institute-of-digital-dentistry-reviews-the-asiga-ultra/). SprintRay is

informed and believes that Asiga launched the Ultra commercially at the Chicago Midwinter Meeting in March 2024 and has marketed it in the United States since that time.

32. Asiga describes the Ultra as a high-precision DLP 3D printer with advanced layer control, high-resolution imaging, and production-oriented features designed for dental, medical, jewelry and other professional and industrial applications. Ex. 12 (https://www.asiga.com/ultra) at 3, 8-9.

33. The Ultra is a resin-based additive manufacturing system that builds 3D objects from photopolymer resin through stereolithographic layer-by-layer curing. The system includes, among other things, (i) a DLP light engine positioned beneath a transparent material film and glass substrate, (ii) a resin tray assembly configured to hold liquid photopolymer, (iii) a vertically removable build platform positioned above the resin tray, and (iv) electronic control systems for image projection, motion control, and positioning of the build platform. *See e.g.*, Ex. 13 (Ultra User Guide) at 7-9 (showing the Asiga Ultra building 3D objects from photopolymer resin through stereolithographic layer-by-layer curing).

34. In addition to the Ultra, Asiga's Max series of 3D Printers, which includes the Max 2 3D Printer ("Max 2"), available as the Max 2 (50) and Max 2 (62), and the Max X Plus 3D Printer ("Max X Plus"), available as the Max X27 Plus, Max X35 Plus, and Max X43 Plus, infringe the Asserted Patents as set forth below. Ex. 14 (https://www.asiga.com/max-2/), Ex. 15 (https://www.asiga.com/max-x-plus/). Asiga launched the Max 2 commercially at the Chicago Midwinter Meeting in March 2024 and has marketed and sold it in the United States since that time. Ex. 16 (https://instituteofdigitaldentistry.com/news/asiga-unveil-the-asiga-ultra-3d-printer-and-max-2/).

35. Asiga describes both the Max 2 and Max X Plus 3D Printers as high-precision DLP 3D printers with advanced layer control, high-resolution imaging, and production-oriented features designed for dental, medical, jewelry and other professional and industrial applications. Ex. 14 (https://www.asiga.com/max-2/), Ex. 15 (https://www.asiga.com/max-x-plus/).

36. The Max 2 and Max X Plus are resin-based additive manufacturing systems that build 3D objects from photopolymer resin through stereolithographic layer-by-layer curing. The systems include, among other things, (i) a DLP light engine positioned beneath a transparent material film and glass substrate, (ii) a resin tray assembly configured to hold liquid photopolymer, (iii) a vertically removable build platform positioned above the resin tray, and (iv) electronic control systems for image projection, motion control, and positioning of the build platform. *See e.g.*, Ex. 17 (Max 2 User Guide) at 7-8 (showing the Asiga Max 2 building 3D objects from photopolymer resin through stereolithographic layer-by-layer curing); Ex. 18 (Max X Plus User Guide) at 8-10 (showing the same for the Asiga Max X Plus).

37. In addition to the Ultra, Max 2, and Max X Plus, Asiga's PRO series of 3D Printers, which includes the PRO 4K 3D Printer ("PRO 4K"), available as the PRO 4K45, PRO 4K65, and PRO 4K80, and the PRO 4K XL 3D Printer ("PRO 4K XL"), available as the PRO 4K45XL, PRO 4K65 XL, and PRO 4K80 XL, infringe the Asserted Patents as set forth below. Ex. 19 (https://www.asiga.com/pro-4k/), Ex. 20 (https://www.asiga.com/pro-4k-xl/).

38. Asiga describes both the PRO 4K and PRO 4K XL Printers as high-precision DLP 3D printers with advanced layer control, high-resolution imaging, and production-oriented features designed for dental, medical, jewelry and other professional and industrial

applications. Ex. 19 (https://www.asiga.com/pro-4k/), Ex. 20 (https://www.asiga.com/pro-4k-xl/).

39. The PRO 4K and PRO 4K XL are resin-based additive manufacturing systems that build 3D objects from photopolymer resin through stereolithographic layer-by-layer curing. The systems include, among other things, (i) a DLP light engine positioned beneath a transparent material film and glass substrate, (ii) a resin tray assembly configured to hold liquid photopolymer, (iii) a vertically removable build platform positioned above the resin tray, and (iv) electronic control systems for image projection, motion control, and positioning of the build platform. *See*, *e*.g., Ex. 21 (PRO 4K User Guide) at 10-12 (showing the Asiga PRO 4K building 3D objects from photopolymer resin through stereolithographic layer-by-layer curing).

40. All of Asiga's 3D Printers, including the Ultra, Max 2, Max X Plus, PRO 4K, and PRO 4K XL (the "Accused Printers"), use Asiga Composer software, which implements the infringing processes as further described below.

## Technical specifications

| Product specification | Ultra (32) | Ultra (50) |
|---|---|---|
| Build Volume X, Y, Z | 119 x 67 x 130mm<br>4.68 × 2.63 × 5.11 inches | 189 x 106 x 130mm<br>7.44 × 4.17 × 5.11 inches |
| Pixel Size | 32µm | 50µm |
| Technology | DLP | DLP |
| Auto-calibrating UV LED | 385nm (365nm and 405nm available on request) | 385nm (365nm and 405nm available on request) |
| Material Compatibility | Use any one of over 500 qualified resins from the world's leading material manufacturers, or create your own. | |
| Software | Asiga Composer software. Lifetime updates included | |
| File Inputs | STL, SLC, PLY, STM (Asiga Stomp file format) | |

## Technical specifications

| Product specification | Max 2 (50) | Max 2 (62) |
|---|---|---|
| Build Volume X, Y, Z | 96 × 54 × 76mm<br>3.77 × 2.12 × 2.99 inches | 119 × 67 × 76mm<br>4.68 × 2.63 × 2.99 inches |
| Pixel Size | 50μm | 62μm |
| Technology | DLP | DLP |
| Auto-calibrating UV LED | 385nm (405nm available on request) | |
| Material Compatibility | Use any one of over 500 qualified resins from the world's leading material manufacturers, or create your own. | |
| Software | Asiga Composer software. Lifetime updates included | |
| File Inputs | STL, SLC, PLY, STM (Asiga Stomp file format) | |

## Technical specifications

| Product specification | Max X27 Plus | Max X35 Plus | Max X43 Plus |
|---|---|---|---|
| Build Volume X, Y, Z | 51.8 × 29.2 × 75mm<br>2.04 × 1.15 × 2.95 inches | 67.2 × 37.8 × 75mm<br>2.65 × 1.49 × 2.95 inches | 82.3 × 46.4 × 75mm<br>3.24 × 1.83 × 2.95 inches |
| Pixel Resolution | 27μm | 35μm | 43μm |
| Technology | DLP | DLP | DLP |
| LED Wavelength | 385nm (high power UV LED) or 405nm | | |
| Transparent Mode™ | Available on 385nm printers only | | |
| Material Compatibility | Asiga materials, 100% Open Material System — use any suitable third party material | | |
| Software | Asiga Composer software. Lifetime updates included | | |
| File Inputs | STL, SLC, PLY, STM (Asiga Stomp file format) | | |

## Technical specifications

| Product specification | PRO 4K45 | PRO 4K65 | PRO 4K80 |
|---|---|---|---|
| Build Volume X, Y, Z | 122 × 69 × 200mm<br>4.8 × 2.71 × 7.87 inches | 176 × 99 × 200mm<br>6.94 × 3.9 × 7.87 inches | 217 × 122 × 200mm<br>8.54 × 4.8 × 7.87 inches |
| Pixel Size - 4K mode | 32μm | 46μm | 56μm |
| Pixel Size - Native mode | 45μm | 65μm | 80μm |
| Technology | DLP | DLP | DLP |
| LED Wavelength | 385nm or 405nm (high power LEDs) | 385nm or 405nm (high power LEDs) | 385nm or 405nm (high power LEDs) |
| Material Compatibility | Asiga materials, 100% Open Material System — use any suitable third party material | | |
| Software | Asiga Composer software. Lifetime updates included | | |
| File Inputs | STL, SLC, PLY, STM (Asiga Stomp file format) | | |

## Technical specifications

| Product specification | PRO 4K45 XL | PRO 4K65 XL | PRO 4K80 XL |
|---|---|---|---|
| Build Volume X, Y, Z | 122 × 69 × 400mm<br>4.8 × 2.71 × 15.75 inches | 176 × 99 × 400mm<br>6.94 × 3.9 × 15.75 inches | 217 × 122 × 400mm<br>8.54 × 4.8 × 15.75 inches |
| Pixel Size - 4K mode | 32μm | 46μm | 56μm |
| Pixel Size - Native mode | 45μm | 65μm | 80μm |
| Technology | DLP | DLP | DLP |
| LED Wavelength | 385nm industrial grade LED.<br>(365nm & 405nm also available) | 385nm industrial grade LED.<br>(365nm & 405nm also available) | 385nm industrial grade LED.<br>(365nm & 405nm also available) |
| Material Compatibility | 500+ materials available. Open Material System — use any suitable third party material | | |
| Software | Asiga Composer software. Lifetime updates included | | |
| File Inputs | STL, SLC, PLY, STM (Asiga Stomp file format) | | |

Ex. 22 (https://www.asiga.com/ultra/), Ex. 14 (https://www.asiga.com/max-2/), Ex. 15 (https://www.asiga.com/max-x-plus/), Ex. 19 (https://www.asiga.com/pro-4k), and Ex. 20

(https://www.asiga.com/pro-4k-xl/) (showing that all Accused Printers use Asiga Composer software).

41. In addition to the Accused Printers, Asiga sells and distributes related components and accessories, including resin tray assemblies, such as Asiga's UltraGLOSS and Endurance resin trays. These components form part of the assemblies and systems claimed in the Asserted Patents.




Ex. 23 (https://support.asiga.com/build-tray-types/) at 3 (showing Asiga's UltraGLOSS resin tray); *see also id.* at 3-4 (showing Asiga's Endurance resin tray and suggested applications). For the Endurance Tray, the layer of the build tray in contact with the resin is "two plies of FEP film." Ex. 24 (https://dentallabnetwork.com/forums/threads/asiga-4k-resin-tray-issues.35447/).

42. As used herein, the "Accused Products" refers collectively to the Accused Printers together with their associated resin tray assemblies, including the UltraGLOSS and Endurance resin trays, and related components and accessories.

43. Asiga markets and offers the Accused Products for sale through its website, which directs customers to authorized resellers and distributors, and through its U.S. sales and distribution channels. Ex. 25 ("Where to Buy") (https://www.asiga.com/where-to-buy/).

44. Asiga identifies authorized resellers and distributors in the United States on its website. Ex. 26 (https://www.asiga.com/united-states-of-america).

45. SprintRay is informed and believes that Asiga has sold and shipped the Accused Printers and related components to customers in this District and throughout the United States since at least March 2024.

46. SprintRay is further informed and believes that Asiga regularly uses the Accused Products in the United States. For example, Asiga operates and demonstrates the Accused Products at industry trade shows, conferences, and events in the United States—including the Chicago Midwinter Meeting, at which Asiga launched the Ultra and Max 2 commercially in March 2024 (*see* Ex. 16 (https://instituteofdigitaldentistry.com/news/asiga-unveil-the-asiga-ultra-3d-printer-and-max-2/)—where Asiga sets up, runs, and demonstrates the Accused Products for attendees and prospective customers. *See* Exs. 27, 28, and 29 (Asiga trade shows, product exhibits, and demonstrations in the United States) (https://www.asiga.com/events-2024, https://www.asiga.com/events-2025, and https://www.asiga.com/events-2026). Asiga also uses and demonstrates the Accused Products through its United States sales and distribution channels and its authorized United States resellers and distributors, which display, operate, and demonstrate the Accused Products to customers in the United States. *See* Ex. 25, Ex. 26 (Asiga "Where to Buy") (https://www.asiga.com/united-states-of-america/). Asiga further creates and publishes videos and other materials depicting its own operation and demonstration of the Accused Products for United States customers, including videos showing the Accused Products' features and how to use them. *See, e.g.*, https://www.youtube.com/watch?v=NNraRSVHI4Y. Through these and other activities, Asiga makes, uses, sells, and offers for sale the Accused Products.

47. SprintRay is informed and believes that Asiga is aware of the Asserted Patents and of its infringement thereof and, at the very least, Asiga is aware based on this Complaint.

**COUNT I**
**(Direct Infringement of the '135 Patent)**

48. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

49. Asiga has infringed and continues to infringe, literally or under the doctrine of equivalents, claims of the '135 Patent in violation of 35 U.S.C. § 271(a), by using the claimed process within the United States, without permission, consent, authorization, or license from SprintRay.

50. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '135 Patent. Claim 1 recites the following limitations:

> A process for producing a three-dimensional object using an imaging unit comprising a predetermined number of discrete imaging elements or pixels, the process comprising:
>
> providing a material to be solidified, the material comprising a filler and a binder;
>
> delivering electromagnetic radiation or synergistic stimulation in a pattern or an image to a building region for solidifying said material;
>
> wherein said delivering of electromagnetic radiation and/or synergistic stimulation is performed selectively to a defined area or volume of said material to be solidified;
>
> wherein an energy density of electromagnetic radiation or synergistic stimulation is at least partially varied within said pattern or image by controlling a gray value or a color value of at least a part of the discrete imaging elements or pixels, and a variation of intensity of electromagnetic radiation or synergistic stimulation within said pattern or image is controlled by a control unit such that when the filler is a reflecting or scattering filler, an energy density of the electromagnetic radiation or synergistic stimulation delivered to a boundary region of said pattern or image is lower than an energy density of the electromagnetic radiation or synergistic stimulation delivered to an inner region of said pattern or image.

51. The Accused Products use an imaging unit comprising a plurality of discrete imaging elements or pixels to project image data into a building region during fabrication.

**Native and 4K Resolution**

The Ultra light engine is equipped with a DLP imaging chip having a 1920x1080 pixel array. The projected image can be spatially shifted at high frequency by a piezoelectric mechanism to produce a 3840x2160 pixel image. The effect simulates a 4K resolution image. Operating in this mode produces images and consequently 3D parts having smoother edges and resolution than produced in the native mode. However, the native pixel size is larger than the pixels of the 4K image, which means that some control is lost over the rendering process at the edges of the image contours. For this reason, the user has the option to switch off the piezoelectric mechanism and operate the light engine in native resolution mode, producing a 2712-by-1528 image. Note that the native resolution image does not use all the pixels present on the DLP chip.

Copyright ASIGA © 01/01/24 9 / 67 VERSION 1.01 (2024-01-01)

Ex. 13 (Ultra User Guide) at 9 (showing that the Ultra includes the Ultra light engine, which is a DLP imaging unit having a predetermined array of 1920 x 1080 discrete imaging elements (pixels) configured to project image patterns into the build region for selective solidification of material in the build region).

***Native and 4K Resolution***

The PRO 4K light engine is equipped with a DLP imaging chip having a 2716-by-1528 pixel array. The projected image can be spatially shifted at high frequency by a piezoelectric mechanism to produce a 3840-by-2160 pixel image. The effect simulates a 4K resolution image. Operating in this mode produces images and consequently 3D parts having smoother edges and resolution than produced in the native mode. However, the native pixel size is larger than the pixels of the 4K image, which means that some control is lost over the rendering process at the edges of the image contours. For this reason, the user has the option to switch off the piezoelectric mechanism and operate the light engine in native resolution mode, producing a 2712-by-1528 image. Note that the native resolution image does not use all the pixels present on the DLP chip.

The Settings menu has a 4K Mode toggle. If the toggle is turned on, the projector operates in 4K mode. If the toggle is off, the projector operates in Native Mode.

Copyright ASIGA © 21/5/25 12 / 71 VERSION 1.04 (2024-08-13)

Ex. 21 (PRO 4K User Guide) at 12 (showing that the PRO 4K printers include a DLP imaging having a predetermined array of 2716 x 1528 discrete imaging elements (pixels) configured to

project image patterns into the build region for selective solidification of material in the build region).




Asiga MAX Technology.mp4






Asiga MAX Technology.mp4

*See* https://vimeo.com/740640861?fl=pl&fe=cm (showing how the imaging unit in the Accused Printers includes a DLP imaging chip consisting of a plurality of discrete pixels to project image data into the build region); *see also* Ex. 14 (https://www.asiga.com/max-2/) at 3 (embedding the same video in the official Max 2 product page).

52. The Accused Products use photopolymer resin material to be solidified in the building region, which Asiga supplies. The photopolymer resin material used in the Accused Products includes a binder component and fillers that affect curing behavior, optical response, and material properties, as reflected in Asiga's resin library. *See e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/).

# Asiga DentaTOOTH

**Biocompatible material for producing Denture Teeth and Temporary Restorations.**

Asiga DentaTOOTH is a high strength, high-wear and stain resistant 3D printable resin for the production of Denture Teeth and Temporary Dental Restorations.

Offering excellent visual characteristics, DentaTOOTH is available in Vita shades A1, A2, A3, B1, B2, and B3.

## Overview

- Use for Denture Teeth and Temporary Dental Restorations
- Colour: Vita Shades A1, A2, A3, B1, B2, and B3
- Wear and Stain Resistant
- Printer compatibility: 385nm 3D printers.
- Manufactured by Asiga under ISO 13485:2016 & EN ISO 13485:2016

## Regulatory approvals

**Biocompatible certification: Class IIa**

**Registered in: USA, Europe, UK, Canada, Australia, New Zealand, Singapore, Malaysia, Vietnam, Turkey**

## Resources

How to manufacture a 3D printed denture (video)

Characterising a crown (video)

Instructions For Use (IFU)

Safety Data Sheet (SDS)




*See, e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/) at 16-17 (showing Asiga DentaTOOTH, a photopolymer resin for use with the Accused Products).

The photopolymer resin material includes "barium glass fillers and inorganic pigments . . . glass fillers ranging from 0.04 to 0.7 microns and . . . 27.7% by weight of inorganic filler." *See* Ex. 31 (DentaTOOTH Instructions for Use) at 1. The photopolymer resin material also consists of binders, including 7,7,9(or 7,9,9)-trimethyl-4,13-dioxo-3,14-dioxa-5,12-diazahexadecane-1,16-diyl bismethacrylate and Tetrahydrofurfuryl Methacrylate (THFMA). *See* Ex. 32 (DentaTOOTH Safety Data Sheet) at 1. Asiga's marketing materials show that Asiga's photopolymer resin contains fillers, as reflected below.

ASIGA




Printer compatibility 385nm (UV)




**Instructions For Use – DentaTOOTH**
**DentaTOOTH A1: PN/03624, DentaTOOTH A2: PN/03625, DentaTOOTH A3: PN/03626, DentaTOOTH B1: PN/03810, DentaTOOTH B2: PN/03812, DentaTOOTH B3: PN/03814.**

**Introduction**:
The following instructions for use are for dental professionals who use Asiga DentaTOOTH as a material for denture teeth and temporary crowns, bridges, inlays, onlays and veneers. This instruction for use also provides information about safety and environmental aspects. In case more information is needed, contact the reseller.

**Indications For Use**:
Asiga DentaTOOTH is intended exclusively for professional dental work.
Asiga DentaTOOTH is a 3D print resin indicated for the manufacturing of 3D printed temporary crowns, bridges, inlays, onlays and veneers to temporarily restore and protect damaged tooth/teeth while a permanent restoration is being prepared. Temporary crowns, bridges, inlays, onlays and veneers are intended to be removed in less than 30 days.
Asiga DentaTOOTH is a 3D print resin indicated for the manufacturing of 3D printed denture teeth. The denture teeth produced are suitable for dental indications including removable dentures for edentulous patients.

**Description, Indications & Effects**:
Asiga DentaTOOTH is intended be used in combination with DLP based 3D printers (i.e. Asiga Max Series, Asiga Ultra Series or Asiga Pro Series) that support Asiga resins. Printer and resin must be optimized with respect to each other in order to produce complete and precise printed parts.
If the printer and resin are not optimized with respect to each other this may have an adverse effect on the accuracy and physical quality of printed parts.
DLP based 3D printers and post-curing lightboxes make use of a light source to polymerize the Asiga resin.
Therefore, operators are advised to wear UV protective glasses when operating a 3D printer and/or lightbox.
Differences in colour nuance may occur due to: production in batches; inadequate shaking and mixing of the original packaging before use; inadequate stirring in the DentaTOOTH resin before use; insufficient post-curing.
DentaTOOTH may be used for temporary restorations on stress-bearing areas in posterior teeth. DentaTOOTH can be used for single tooth preparations and bridge preparations. It is recommended that no more than one pontic be positioned between any two prepared teeth.
DentaTOOTH comprises Dimethacrylate monomers, photoinitiators, barium glass fillers and inorganic pigments.
DentaTOOTH contain glass fillers ranging from 0.04 to 0.7 microns and contains 27.7% by weight of inorganic filler.

Ex. 31 (DentaTOOTH Instructions for Use) at 1 (showing that the photopolymer resin contains fillers). Asiga's marketing materials also show that Asiga's photopolymer resin includes binder components, as shown below.

ASIGA
DIGITAL MANUFACTURING SOLUTIONS

Precautionary **P statements:**
**P201** – Obtain special instructions before use.
**P202** – Do not handle until all safety precautions have been read and understood.
**P261** – Avoid breathing dust/ fume/gas/mist/vapours/spray.
**P273** – Avoid release to the environment.
**P280** – Wear protective gloves/protective clothing/eye protection/face protection.
**P308 + P313** – IF exposed or concerned: Get medical advice/attention.
**P302 + P352** – IF ON SKIN: Wash with plenty of soap and water.
**P305 + P351 + P338** – IF IN EYES: Rinse cautiously with water for several minutes. Remove contact lenses, if present and easy to do. Continue rinsing.
**P304 + P340** – IF INHALED: Remove person to fresh air and keep comfortable for breathing.
**P501** – Dispose of contents/container in accordance with local regulations.

2.3. Other hazards:
Polymerization with heat evolution may occur in the presence of radical forming substances (e.g. peroxides), reducing substances, and/or heavy metal ions.
Results of PBT and vPvB assessment: no data available.

**SECTION 3 : COMPOSITION / INFORMATION ON INGREDIENTS**

3.1. Substance : Not applicable.

3.2. Mixture:

| Description | CAS number | EU number/ ECHA list number | REACH reg. nr. | Conc. (%) | Classification: 1272/2008/EC (CLP) | | |
|---|---|---|---|---|---|---|---|
| | | | | | Hazard pict. | Hazard cat. | H phrase |
| **7,7,9(or 7,9,9)-trimethyl-4,13-dioxo-3,14-dioxa-5,12-diazahexadecane-1,16-diyl bismethacrylate*** | 72869-86-4 | 276-957-5 | - | 10 – 25 | GHS07 Warning | Skin Sens. 1<br>Eye Irrit. 2<br>Aquatic Chronic. 2 | H317<br>H319<br>H411 |
| **Tetrahydrofurfuryl methacrylate*** | 2455-24-5 | 219-529-5 | - | 10 – 20 | GHS07 Warning | Skin Sens. 1<br>Skin Irrit. 2<br>Eye Irrit. 2<br>STOT SE. 3 | H317<br>H315<br>H319<br>H335 |

Ex. 32 (DentaTOOTH Safety Data Sheet) at 2 (showing that the photopolymer resin includes binder components).

53. The imaging unit of the Accused Products, which delivers UV electromagnetic radiation, projects patterned image data to the build region of the Accused Products corresponding to cross-sections of the three-dimensional object being formed.



The Asiga Ultra

*See e.g.*, https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the addition of photopolymer resin into the reservoir which is the material that will be solidified in the build region).

Ultra User Guide

4. A cross-sectional image of the object being constructed is projected onto the underside of the material film, causing photopolymer to harden in the shape of the image.



*See, e.g.*, Ex. 13 (Ultra User Manual) at 9 (showing that the projected images correspond to cross-sectional layers of a three-dimensional object and are projected onto the underside of the material film, causing photopolymer to harden in the shape of the image); Ex. 17 (Max 2 User Manual) at 8 (same); Ex. 21 (PRO 4K User Manual) at 10-12 (same).

54. As shown below, the Accused Products deliver UV electromagnetic radiation to the material in a pattern or image corresponding to the object being formed, including through a light engine configured to project image data onto the building region. The delivery of electromagnetic radiation is performed selectively to defined areas or volumes of the material, such that only targeted portions of the material are solidified during each exposure step.







*See* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing how the Accused Products deliver UV electromagnetic radiation to the material).



*See, e.g.*, Ex. 15 (https://www.asiga.com/max-x-plus/) at 3 (annotated) (showing that the Accused Printers include a UV DLP light engine image forming unit that generates projected images).

Ultra User Guide

4. A cross-sectional image of the object being constructed is projected onto the underside of the material film, causing photopolymer to harden in the shape of the image.



5. The model is lifted out of the material to separate it from the material film.



6. The process is repeated until the model has finished building.

The SPS process actively forms layers of precise thickness regardless of the cross-sectional area of the model or the viscous behaviour of the photopolymer resin. As a result, models of high fidelity are produced. The Ultra is ideal for direct manufacturing applications including medical prostheses and jewellery pattern production.

*See, e.g.*, Ex. 13 (Ultra User Guide) at 9 (showing the Accused Products delivering UV electromagnetic radiation in a pattern or image corresponding to the object being formed, thereby selectively solidifying targeted portions of the material).

55. The Accused Products deliver electromagnetic radiation in a spatially controlled manner such that different regions of the material receive different amounts of energy. In particular, the Accused Products control the energy density of electromagnetic radiation delivered by the DLP light engine to the solidifiable material. As known in the art, energy density is the product of the specific light intensity of the DLP light engine applied over a given exposure time.

$$E = H * t$$

Where the Energy Density (E) delivered to the defined area of the solidifiable material in mJ/cm$^2$ is the product of the Light Intensity (H) in mW/cm$^2$ of the DLP light engine and the Exposure Time (t) in seconds (s).




*See* https://www.youtube.com/watch?v=5_AEB8uR_h0 (showing that the Accused Products utilize a "Light Intensity" parameter and an "Exposure Time" parameter, indicating that the

energy density of the electromagnetic radiation delivered to the solidifiable material is necessarily the product of the light intensity and the exposure time set by the user).

### 8.5.5 Projection Parameters

**Light Intensity** Latest light sensor value (mW/cm²·s) on the printer, affects Exposure Time. This is a readonly value for firmware versions < 2017-03.

**Light Intensity Control** Activate the adjusted light intensity value, otherwise the build will be printed at maximum intensity.

**Exposure Time** Standard duration (s) for each layer, which will affect the default values of Z and XY Compensation.

**Wait Time (After Exposure)** Increase for materials that require time to solidify.

### 8.5.6 Vertical Stage Parameters

The actual velocity that is realized during the print may not accurately reflect the provided value in Composer.

**Shrinkage Compensation Enable** Set to 1 to perform exposure in two steps by exposing fill first and then the perimeter afterwards. Note that this will double the time required for exposure. This parameter is replaced by "Two-Step Exposure Border Width" in 2017-06-08 firmware and later.

**Two-Step Exposure Border Width** Set border width of the perimeter in mm to perform exposure in two steps by exposing fill first and then the perimeter afterwards. Note that this will double the time required for exposure.

**Separation Velocity** Desired vertical speed (mm/s) at which the build platform separates each layer from the curing surface. Reduce for large cross-sections.

**Separation Distance** Desired vertical distance (mm) the build platform moves out after exposure.

86

Ex. 33 (Composer User Manual) at 86 (defining the Accused Products' "Light Intensity" parameter and "Exposure Time" parameter).

56. The Accused Products specifically operate such that the energy density of the electromagnetic radiation delivered to the border region of the defined area of the solidifiable material corresponding to the projected pattern of electromagnetic radiation intentionally differs from the energy density of the electromagnetic radiation delivered to the non-border region, by adjusting the energy intensity of pixels corresponding to the border region relative to the non-border region through a relative energy scaling factor applied before the electromagnetic radiation is projected.



*See* https://www.youtube.com/watch?v=5_AEB8uR_h0 (showing that the Accused Products utilize a "Fill Exposure" and "Border Exposure" parameter in percentage units which differ).

### 8.5.3 Rendering Parameters

The following parameters apply to the "Normal" exposure range only and may require modification to Composer's Printer INI files to be visible.

**Support Exposure** Relative energy (%) that is applied to supports. Typical usage is to overexpose (>100%) supports for increased rigidity. The default "Exposure Time" will be increased relatively.

**Fill Exposure** Relative energy (%) that is applied to within the border of parts. Typical usage is to underexpose (<100%) inner regions to reduce heat deformation.

**Fill Noise** Adjusts fill pixel values by the desired random amount (%). Typically used in conjunction with "Fill Exposure".

**Border Exposure** Relative energy (%) that is applied to the border of parts. Typical usage is to maintain or be slightly higher (≥100%) than "Fill Exposure".

**Border Width** Distance (mm) from edge of parts that is treated as the border that is unaffected by "Fill Exposure" or "Fill Noise".

**Border Noise** Adjusts border pixel values by the desired random amount (%). Typically used to form natural matte surface.

The final pixel value of the border may be adjusted by the Z-Compensation function as it will prefer to expose the lowest pixel value out of all the affected layers.

A normal distribution random value generator is used to add noise to the pixel values. A normal distribution means the adjusted pixel value will most likely remain closer to the original pixel value.

85

Ex. 33 (Composer User Manual) at 85. The above shows how the Accused Products intentionally vary the density of the electromagnetic radiation delivered to the solidifiable material based on whether energy is delivered to boundary regions or interior regions using the "Fill Exposure" and "Border Exposure" parameters.

57. Thus, the energy density delivered to the border regions compared to the non-border regions of the pattern of electromagnetic radiation delivered to discrete regions of the solidifiable material is reflected by the following formulas:

$$E_{border} = H * \mathrm{t} * \boldsymbol{BE}$$

$$E_{non-border} = H * \mathrm{t} * \boldsymbol{FE}$$

Where the energy density delivered to the border region ($E_{border}$) is controlled relative to the energy density delivered to the non-border regions ($E_{non\text{-}border}$) based on the **Border Exposure (BE)** and **Fill Exposure (FE) parameters**, respectively.

58. For example, using the below exposure values in a public demonstration of the Asiga Composer software, the energy densities delivered to the border versus non-border regions of the projected image would be different, with the border regions receiving energy of a lower density:

$$E_{border} = 7.0 \frac{Mw}{cm^2} * 3.541\ \mathrm{s} * \mathbf{0.72} = \mathbf{17.743}\ mJ/cm^2$$

$$E_{non-border} = 7.0 \frac{Mw}{cm^2} * 3.541\ \mathrm{s} * \mathbf{1} = \mathbf{24.787}\ mJ/cm^2$$




*See* https://www.youtube.com/watch?v=5_AEB8uR_h0 (showing how the "Border Exposure" value for the print range is "72%" and the "Fill Exposure" value for the second print range remains "100%," with an exposure time of 3.541 seconds and an intensity level of 7.00 mW/cm$^2$, resulting in different, lower energy density delivered at the border region compared to the non-border region of the projected image).

59. SprintRay is informed and believes based on publicly available information that the energy density of the electromagnetic radiation delivered to different regions of the pattern

or image is at least partially varied by controlling the gray values of the discrete imaging elements or pixels. SprintRay is further informed and believes that the Accused Products deliver a different energy density to the border region than to the non-border region of a projected layer by controlling the gray values of the pixels, as reflected in Asiga's Composer software, which permits setting a "Border Exposure" value for a print rage that differs from, and is lower than, the "Fill Exposure" value for that same range. *See* https://www.youtube.com/watch?v=5_AEB8uR_h0.

60. SprintRay is informed and believes that the Accused Products control grayscale values and exposure parameters such that boundary regions receive lower energy density than interior regions when printing materials that scatter or reflect radiation, in order to control print accuracy and material behavior. Asiga's Composer software permits a user to set a "Border Exposure" value for a print range that differs from the "Fill Exposure" value for that same range, resulting in a different energy density being delivered to the border region than to the non-border region of a projected layer. For example, SprintRay is informed and believes that when the filler is a reflecting or scattering filler, like in the AudiaFORM resin, the energy density delivered to a boundary region is lower than the energy density delivered to an inner region of the pattern or image.

**Mixing Before Use**:
In Bottle: Agitate/shake bottle vigorously prior to pouring for at least one minute.
In Material Tray: Stir material with a soft spatula. Take care not to damage the film of the Material Tray.
This step is necessary to re-disperse the (possible) pigment sediment from the bottom of the vessel.
Colour deviation and print failures may occur if insufficiently mixed.

**Fill Material Tray**:
Ensure the temperature of the resin is between 15 and 30°C / 59 and 86°F and prevent exposure to direct sunlight.
Pour the resin into the material tray of the 3D printer.

**Printer Settings**:
Asiga AudiaFORM is optimised to build parts using light with 385nm or 405nm wavelength.
For Printer Settings, See manual or user guides of Asiga 3D Printers (Asiga Max Series or Asiga Pro Series).
Ensure the film of the Material Tray is clear of any debris before starting the print.
Ensure you are using the latest material ini file. You can access the latest material ini file for this material in your Asiga account online here:
https://www.asiga.com/accounts/#tab_material

**SECTION 9: PHYSICAL AND CHEMICAL PROPERTIES**

9.1. Information on basic physical and chemical properties:

| Parameter | | Test method: | Remarks: |
|---|---|---|---|
| 1. **Appearance:** | grey liquid | | |
| 2. **Odour:** | characteristic | | |

Ex. 34 (AudiaFORM Instructions for Use) at 1, Ex. 35 (AudiaFORM Safety Data Sheet) at 4 (showing that Asiga AudiaFORM is a gray resin containing pigment particles that may sediment and require re-dispersion before use, which is consistent with the presence of particulate filler materials that reflect or scatter light); *see also* https://www.youtube.com/watch?v=5_AEB8uR_h0.

61. Asiga's infringement of the '135 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

62. Asiga's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

63. Despite knowledge of the '135 Patent and at least since service of this Complaint, Asiga has continued its infringing conduct with knowledge that its Accused Products infringe the '135 Patent.

64. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's direct infringement of the '135 Patent.

**COUNT II**
**(Indirect Infringement of the '135 Patent)**

65. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

66. As set forth above, and at least upon service of this Complaint, Asiga has knowledge of the ’135 Patent and of its infringement thereof.

67. After acquiring knowledge of the ’135 Patent, Asiga has actively, knowingly, and intentionally induced infringement of the ’135 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the ’135 Patent by performing the claimed process using the Accused Products. When the Accused Products are used to 3D print an object, they perform the method of Claim 1 described above. There is no way to use the Accused Products to 3D print without performing the process that infringes Claim 1, and the Accused Products have no purpose other than to 3D print.

68. Asiga’s inducement includes providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products, which necessarily infringes for the reasons discussed above. Examples of such instructions are shown below:




*See.*, *e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); *see also* Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same).




S*ee e.g*., https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it).

69. Online videos, excerpts of which are shown below, provide step-by-step instructions on how to use the Accused Products in an infringing manner.




3D Print set-up in Composer
ASIGA
DENTAL SERIES


Asiga Composer
File Edit View Options Tools Window Help
Parts List
Selection Information
Property
Value
Selected Parts 2
Transform Panel
Translate:
Rotate:
Scale:
Uniform Scale
Apply
Mirror:
Create Copy
Apply
Redo last undone action
ASIGA
DENTAL SERIES
Printer: FREEFORM Material: Asiga DentaGUIDE Thickness: 0.05 Unit: mm


Agitate bottle prior to pouring material into Build Tray.
ASIGA
DENTAL SERIES


Pour material to level marker on Build Tray.
ASIGA
DENTAL SERIES







*See* https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner).





## A Workflow for the Modern Restorative Practice

A typical 3D Printed Prototype Workflow looks like this:

**Data Acquisition**
Intraoral scan, CBCT, Photos and/or facial scan.

**Virtual Articulation**
Align digital models to a physiologic position.

**Digital Design**
Create the functional and aesthetic design-prior to day of case.

**Day Of Prep**
After prep scan, align design over preps, and attach margins

**3D Print the Prototype**
Fabricate the design using an Asiga printer. In this case, the Rodin Sculpture material from Pac Dent was used. (The Crown Kit enables rapid printing for small-unit prototypes.) Print and finish appropriately.

**Seat and Evaluate**
Try in provisional and verify marginal fit, & adjust occlusion.

**Cement prototype**
Test aesthetics and occlusion.

**Refine and Approve**
Make any modifications based on clinical feedback.

**Scan the Approved Prototype**
Capture the final intraoral scan for lab fabrication.

**Final Restoration Fabrication**
Laboratory uses the approved STL to mill zirconia or press ceramics.

**Final Delivery**
Seat the restorations with minimal adjustment. Predictable and efficient.

Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations).


VideoHub
UltraGLOSS workflow
Video Hub
UltraGLOSS™
by Asiga
ASIGA


VideoHub
UltraGLOSS workflow
Video Hub
3D Print
ASIGA


VideoHub
UltraGLOSS workflow
Video Hub
ASIGA
UltraGLOSS
REMOVE ALL DEBRIS FROM FILM
BEFORE STARTING NEXT BUILD
ASIGA


VideoHub
UltraGLOSS workflow
Video Hub
ASIGA
UltraGLOSS
REMOVE ALL DEBRIS FROM FILM
ASIGA




*See* https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

70. After having acquired knowledge of the ’135 Patent, Asiga has also contributorily infringed the ’135 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the ’135 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Asiga sells and distributes resin tray assemblies such as Asiga’s UltraGLOSS and Endurance resin trays, specifically for use with the Accused Printers. These components form a material part of the assembly that performs the methods of the ’135 Patent. Ex. 23 (https://support.asiga.com/build-tray-types/) at 3 (showing Asiga’s UltraGLOSS resin tray); *id.* at 3-4 (showing Asiga’s Endurance resin tray). Further, the Accused Products use photopolymer resin material to be solidified in the building region, which Asiga supplies. The photopolymer resin material used in the Accused Products includes a binder component

and fillers that affect curing behavior, optical response, and material properties, as reflected in Asiga's resin library and is a material part of the overall assembly that performs the methods of the '135 Patent. *See e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/).

71. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, *i.e.*, to 3D print an object, the Accused Products, including these build trays and dental materials, perform the method of Claim 1, as described above. There is no way to use the Accused Products to 3D print without performing the process that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Asiga has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '135 Patent and are not staple articles suitable for substantial non-infringing use.

72. Asiga has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '135 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '135 Patent, by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same);

Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

73. Asiga's indirect infringement of the '135 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

74. Asiga's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

75. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's indirect infringement.

**COUNT III**
**(Direct Infringement of the '143 Patent)**

76. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

77. Asiga has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '143 Patent in violation of 35 U.S.C. § 271(a), by using

the Accused Products to perform the claimed process within the United States, without permission, consent, authorization, or license from SprintRay.

78. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '143 Patent. Claim 1 recites the following limitations:

> A method for producing a three-dimensional object, comprising:
>
> supplying solidification energy to a portion of a solidifiable material corresponding to a cross-section of the three dimensional object in accordance with a first bitmap mask; and
>
> supplying solidification energy to the portion of the solidifiable material corresponding to the cross-section of the three-dimensional object in accordance with a second bitmap mask, wherein the second bitmap mask is a partial mask within the first bitmap mask.

79. The Accused Products perform a layer-wise additive manufacturing process in which photopolymer resin is selectively solidified through exposure to patterned electromagnetic radiation. As shown below, the Accused Products include an image forming unit comprising a DLP light engine configured to generate projected images corresponding to cross-sectional layers of a three-dimensional object, where such images constitute masks in the form of digital bitmaps composed of discrete pixels.




Consistent results with Asiga 3D printers. Asiga SPS Technology How it works!

*See* https://www.youtube.com/watch?v=zrKqaWuNCG8 (showing that the Accused Products include a DLP Projector or light engine).

Ultra User Guide

4. A cross-sectional image of the object being constructed is projected onto the underside of the material film, causing photopolymer to harden in the shape of the image.



*See* Ex. 13 at (Ultra User Manual) 9 (showing that the projected images correspond to cross-sectional layers of a three-dimensional object).




How to manufacturer a 3D printed Denture with Asiga

*See* https://www.youtube.com/watch?v=N8kdhTM5KPw (showing how, through Asiga Composer, these images constitute masks in the form of digital bitmaps composed of discrete pixels).

80. SprintRay is informed and believes that the Accused Products further generate multiple masks or bitmaps corresponding to a single layer of the object, including separate bitmaps corresponding to different portions of the layer. For example, when printing a solid 3D disk without any supports, on information and belief, the Accused Products generate a first bitmap corresponding to an interior region of the layer and border region, and a second bitmap corresponding to just the border region of the layer, where each bitmap defines distinct portions of the same cross-sectional layer and the second bitmap is partially within the first bitmap.

81. SprintRay is informed and believes that the Accused Products further expose the multiple masks or bitmaps in separate steps to form the layer. In particular, SprintRay is informed and believes that the Accused Products perform multiple exposure steps for a single layer, including a first exposure using a bitmap corresponding to the interior and border region and a second exposure using a bitmap corresponding to just the border region, such that each bitmap is independently projected onto the solidifiable material to cure different portions of the same layer.




**Asiga Composer Workflow**

*See* https://www.youtube.com/watch?v=flbbb9X1d0w (showing how Asiga Composer, utilized by all Accused Printers, defines a specific value for "Two-Step Exposure Border Width" in the advanced parameters of all build settings).

82. As shown below, the Accused Products further control exposure parameters separately for different masks or bitmaps, including through software-configurable parameters that define exposure conditions for different portions of a layer, thereby enabling selective curing of different regions of the layer using separate bitmaps.



Asiga Composer Workflow

*See* https://www.youtube.com/watch?v=flbbb9X1d0w (showing how Asiga Composer allows the user of the Accused Printers to control exposure parameters separately for different masks or bitmaps, including through software-configurable parameters that define exposure conditions for different portions of a layer, such as Support Exposure, Fill Exposure, Border Exposure / Width / Noise, and Two-Step Exposure Border Width, enabling selective curing of different regions of the layer using separate bitmaps).

83. Asiga's infringement of the '143 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

84. Asiga's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

85. Despite Asiga's knowledge of the '143 Patent and at least since service of this Complaint, Asiga has continued its infringing conduct with knowledge that its Accused Products infringe the '143 Patent.

86. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's direct infringement of the '143 Patent.

**COUNT IV**
**(Indirect Infringement of the '143 Patent)**

87. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

88. As set forth above, at least upon service of this Complaint, Asiga has knowledge of the '143 Patent and of its infringement thereof.

89. After acquiring knowledge of the '143 Patent, Asiga has actively, knowingly, and intentionally induced infringement of the '143 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the '143 Patent by performing the claimed process using the Accused Products. When the Accused Products are used to 3D print an object, they perform the method of Claim 1 as described above. There is no way to use the Accused Products to 3D print without performing the process that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print.

90. Asiga's inducement includes providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products, which necessarily infringes for the reasons

discussed above. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

91. After having acquired knowledge of the '143 Patent, Asiga has also contributorily infringed the '143 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '143 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Asiga sells and distributes resin tray assemblies such as Asiga's UltraGLOSS and Endurance resin trays, specifically for use with the Accused Printers. These components form a material part of the assembly that performs the methods of the '143 Patent. Ex. 23 at 3 (https://support.asiga.com/build-tray-types/) (showing Asiga's UltraGLOSS

resin tray); *id.* at 3-4 (showing Asiga's Endurance resin tray). Further, the Accused Products use photopolymer resin material to be solidified in the building region, which Asiga supplies. The photopolymer resin material used in the Accused Products includes a binder component and fillers that affect curing behavior, optical response, and material properties, as reflected in Asiga's resin library and is a material part of the overall assembly that performs the methods of the '143 Patent. *See e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/).

92. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, perform at least the method of Claim 1, as described above. There is no way to use the Accused Products to 3D print without performing the process that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Asiga has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '143 Patent and are not staple articles suitable for substantial non-infringing use.

93. Asiga has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '143 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '143 Patent, by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner. *See., e.g.*, Ex. 36

(https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

94. Asiga's indirect infringement of the '143 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

95. Asiga's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

96. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's indirect infringement.

## COUNT V
## (Direct Infringement of the '316 Patent)

97. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

98. Asiga has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the ’316 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

99. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the ’316 Patent. Claim 1 recites the following limitations:

> A device for producing at least one three-dimensional object by solidifying a solidifiable material, comprising:
>
> a device for supply of energy to a building region, the energy supply device being capable of solidifying the solidifiable material;
>
> an object carrier capable of carrying the object to be produced; a solidifiable material carrier/provider being arranged to provide solidifiable material at least in the building region, wherein the building region is between the object carrier and the device for supply of energy; and
>
> a sensor arranged to sense or measure and output a signal indicative of a condition selected from the group consisting of (i) a separation force of the object carrier from a building plane in the building region between the object carrier and the device for supply of energy, and ii) a separation force of the solidifiable material carrier/provider from the building plane between the object carrier and the device for supply of energy; and
>
> a controller configured to initiate the building of the at least one three-dimensional object based on an initial set of build parameters, to receive the signal indicative of the condition from the at least one sensor during the building of the at least one three-dimensional object and to adjust the value of at least one build parameter included in the set of build parameters from an initial value to an adjusted value based on the received signal, wherein the at least one build parameter to be adjusted includes at least one build parameter corresponding to a distance of the object carrier from the building plane in the building region.

100. Asiga’s infringing acts include, without limitation, making, using, offering for sale, selling, and importing resin-based additive manufacturing systems, including the Accused Printers, which incorporate sensor-based feedback and control mechanisms for monitoring and adjusting build parameters during the printing process, as claimed in the ’316 Patent.



*See,* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing photopolymer resin being added to the reservoir which shows that the Accused Products are resin-based additive manufacturing systems).






*See,* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the Accused Products' autocalibration and active layer monitoring features which provide sensor-based feedback and control mechanisms to monitor and adjust build parameters during the printing process).

101. As shown below, the Accused Products include an energy delivery device for solidifying material, an object carrier for supporting the printed object, and a material carrier for supplying solidifiable material in a building region. The Accused Products include one or more sensors configured to generate signals indicative of separation forces between the object carrier, the building plane, and the material carrier during printing.








*See, e.g.*, https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the Accused Products' (a) auto-calibrating UV LED, which is an energy delivery device for solidifying material, (b) magnetic platform holder, which is an object carrier for supporting the printed object, and (c) resin tray, which is a material carrier for supplying solidifiable material in a building region).

102. As reflected in Asiga's software and system operation, including through the "Separation Detect" functionality in Asiga Composer, these signals are used by a controller to dynamically adjust movement parameters corresponding to the distance of the object carrier from the building plane.







Ex. 42 ("What is Separation Detection") (https://vimeo.com/1105524590?fl=pl&fe=cm, embedded in https://support.asiga.com/quick-tip/) (showing the "Separation Detect" functionality in Asiga Composer, which signals the controller to dynamically adjust movement parameters corresponding to the distance of the object carrier from the building plane).

103. SprintRay is informed and believes that Asiga's "Separation Detect" utilizes sensors, in the form of load cells positioned under the basin, to detect changes in force during layer separation and to adjust and "reduc[e] the distance that the build plate must vertically travel in between each layer which translates to a faster print time." Ex. 42 ("What is Separation Detection") (https://vimeo.com/1105524590?fl=pl&fe=cm, embedded in https://support.asiga.com/quick-tip/) at 3:11-3:27. The conditions and build parameters measured and adjusted through Asiga's "Separation Detect" functionality are displayed in the image above.

104. Asiga's infringement of the '316 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.




Asiga Max UV printer disassembly, cleaning, repair, and maintenance

https://www.youtube.com/watch?v=iEQYzjRUj_o (showing four load cells arranged beneath the basin assembly in an Accused Printer, visible upon removal of the basin assembly).

105. Asiga's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

106. Despite its knowledge of the '316 Patent and at least since service of this Complaint, Asiga has continued its infringing conduct with knowledge that its Accused Products infringe the '316 Patent.

107. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's direct infringement of the '316 Patent.

**COUNT VI**
**(Indirect Infringement of the '316 Patent)**

108. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

109. As set forth above, at least upon service of this Complaint, Asiga has knowledge of the '316 Patent and of its infringement thereof.

110. After acquiring knowledge of the '316 Patent, Asiga has actively, knowingly, and intentionally induced infringement of the '316 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to make and use the Accused Products in a manner that embodies each element of at least Claim 1 of the '316 Patent.

111. Asiga's inducement includes providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products, which necessarily infringes for the reasons

discussed above. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

112. After having acquired knowledge of the '316 Patent, Asiga has also contributorily infringed the '316 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '316 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Asiga sells and distributes resin tray assemblies such as Asiga's UltraGLOSS and Endurance resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Asiga printers. Ex. 23 (https://support.asiga.com/build-tray-types/) at 3 (showing Asiga's UltraGLOSS resin tray); *id.*

at 3-4 (showing Asiga's Endurance resin tray). Further, the Accused Products use photopolymer resin material to be solidified in the building region, which Asiga supplies. The photopolymer resin material used in the Accused Products includes a binder component and fillers that affect curing behavior, optical response, and material properties, as reflected in Asiga's resin library. *See e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/).

113. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Asiga has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '316 Patent and are not staple articles suitable for substantial non-infringing use.

114. Asiga has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '316 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '316 Patent, by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner. *See., e.g.*, Ex. 36

(https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

115. Asiga's indirect infringement of the '316 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

116. Asiga's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

117. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's indirect infringement.

## COUNT VII
## (Direct Infringement of the '355 Patent)

118. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

119. Asiga has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the ’355 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

120. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the ’355 Patent. Claim 1 recites the following limitations:

> A multi-layer assembly for making a three-dimensional object by solidifying a solidifiable material, comprising:
>
> > a rigid or semi-rigid solidification substrate assembly comprising a frame and a rigid or semi-rigid translucent solidification substrate disposed in the frame;
> >
> > a film assembly, wherein the rigid or semi-rigid solidification substrate assembly is connected to the film assembly, and the film assembly includes at least one frame and a film disposed in the at least one frame.

121. As shown below, the Accused Products include, without limitation, the Accused Printers used with UltraGLOSS and Endurance resin trays, each of which comprises a multi-layer assembly for making a 3D object by solidifying a solidifiable material, including resin, as claimed in the ’355 Patent. The Accused Printers include a rigid or semi-rigid solidification substrate assembly comprising a support frame mounted to the base of the printer, on which a rigid or semi rigid translucent substrate (i.e., a glass plate) is positioned and secured.




The Asiga Ultra




The Asiga PRO 4K




Unboxing the Asiga Max 2

*See* https://www.youtube.com/watch?v=NNraRSVHI4Y, https://www.youtube.com/watch?v=nyfT-SRwKu8 (same), https://www.youtube.com/watch?v=wXc0PfDluMg (showing the Accused Printers' support frames on which the glass plate, the rigid or semi rigid translucent substrate, is positioned and secured).

122. As shown below, the Accused Products further include a resin tank comprising a film assembly that is mounted to the support frame and disposed above the substrate. The film assembly includes a frame and at least one film disposed within the frame, including a permeable film and a lower diffusion film (in the case of UltraGLOSS) or a high-transparency film (in the case of Endurance). The films are secured within the frame and are tensioned across the bottom of the resin tank.




Asiga LIFT™ explainer




Asiga LIFT™ explainer




*See* https://www.youtube.com/watch?v=138ocHRap0w (showing the build tray of the Accused Products includes film disposed within the frame, including a diffusing film and a permeable Teflon film).




*See* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the permeable Teflon film layer disposed within the frame).



The Asiga Ultra




Asiga Max 2



**The Asiga PRO 4K**

*See* https://www.youtube.com/watch?v=NNraRSVHI4Y, https://www.youtube.com/watch?v=F-y1WpwtJg8, https://www.youtube.com/watch?v=nyfT-SRwKu8 (showing the Accused Products where the film assemblies are mounted to the support frame and disposed above the substrate).

Ultra User Guide

1. The model under construction is positioned above the material of photopolymer. The material bottom is made from a flexible transparent Teflon film which is supported by a glass plate.



Ex. 13 (Ultra User Guide) at 8 (describing how the Accused Printers include a glass plate, the translucent substrate, which supports the Teflon film assembly disposed above the substrate); Ex. 17 (Max 2 User Guide) (same), Ex. 18 (Max X Plus User Guide) (same), Ex. 21 (PRO 4K User Guide) (same).

123. In the Accused Products, the film assembly is connected to the substrate assembly through the support frame such that the tensioned films, are positioned above the substrate and form a solidification interface for the resin during printing.




*See* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the build tray, which is a film assembly including a frame and tensioned film disposed within the frame across the bottom of the build tray, positioned above the glass plate (substrate) to form a solidification interface).

124. Asiga's infringement includes, without limitation, providing and selling resin trays assemblies, substrate assemblies, and film assemblies that satisfy the structural and functional limitations of at least Claim 1 of the '355 Patent. *See, e.g.*,

https://www.youtube.com/watch?v=NNraRSVHI4Y; Ex. 23 (https://support.asiga.com/build-tray-types/) at 3-5; Ex. 43 (https://www.asiga.com/the-ultra-crown-kit/) at 1-3.

125. Asiga's infringement of the '355 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

126. Asiga's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

127. Despite its knowledge of the '355 Patent and at least since service of this Complaint, Asiga has continued its infringing conduct with knowledge that its Accused Products infringe the '355 Patent.

128. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's direct infringement of the '355 Patent.

**COUNT VIII**
**(Indirect Infringement of the '355 Patent)**

129. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

130. As set forth above, at least upon service of this Complaint, Asiga has knowledge of the '355 Patent and of its infringement thereof.

131. After acquiring knowledge of the '355 Patent, Asiga has actively, knowingly, and intentionally induced infringement of the '355 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to make and use the Accused Products in a manner that embodies each element of at least Claim 1 of the '355.

132. Asiga's inducement includes providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products, which necessarily infringes for the reasons discussed above. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

133. After having acquired knowledge of the '355 Patent, Asiga has also contributorily infringed the '355 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '355 Patent and are not staple articles suitable for substantial non-infringing use.

For example, as discussed above, Asiga sells and distributes resin tray assemblies such as Asiga's UltraGLOSS and Endurance resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Asiga printers. Ex. 23 (https://support.asiga.com/build-tray-types/) at 3 (showing Asiga's UltraGLOSS resin tray); *id.* at 3-4 (showing Asiga's Endurance resin tray). Further, the Accused Products use photopolymer resin material to be solidified in the building region, which Asiga supplies. The photopolymer resin material used in the Accused Products includes a binder component and fillers that affect curing behavior, optical response, and material properties, as reflected in Asiga's resin library. *See e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/).

134. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Asiga has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '355 Patent and are not staple articles suitable for substantial non-infringing use.

135. Asiga has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '355 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third

parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the ’355 Patent, by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product’s features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

136. Asiga’s indirect infringement of the ’355 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

137. Asiga’s indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

138. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's indirect infringement.

**COUNT IX**
**(Direct Infringement of the '555 Patent)**

139. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

140. Asiga has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '555 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

141. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '555 Patent. Claim 1 recites the following limitations:

> A substrate assembly for use with a three-dimensional printer reservoir, the reservoir including a frame defining a cavity adapted to be at least partially filled with a photosensitive liquid, the substrate assembly comprising:
>
> a first layer comprising a permeable film adapted to be configured with a lower portion of the cavity and to hold the photosensitive liquid within the cavity;
>
> a second layer configured below the first layer; and
>
> a third layer comprising a permeable substrate disposed between the first layer and the second layer.

142. The Accused Products include a substrate assembly for use with a 3D printer reservoir. The Accused Printers include a resin tank comprising a rigid frame that defines a cavity adapted to be at least partially filled with photosensitive resin during printing.




*See* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing liquid photopolymer resin being poured into the cavity of a resin tank of a build tray).

143. The substrate assembly includes a first layer comprising a permeable film configured to form a lower portion of the cavity and to hold resin within the reservoir.




https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the Teflon film layer at the bottom of the cavity of the build tray which retains the photosensitive liquid).




**Asiga LIFT™ explainer**




*See* https://www.youtube.com/watch?v=jRBbtgkT70g (showing that the teflon film layer is the layer that contacts the photosensitive material indicating that it is the layer that holds the photosensitive material in within the build tray).



Asiga Max 2


The Asiga Ultra


The Asiga PRO 4K

*See* https://www.youtube.com/watch?v=NNraRSVHI4Y,

https://www.youtube.com/watch?v=F-y1WpwtJg8, and

https://www.youtube.com/watch?v=nyfT-SRwKu8 (showing the film layer at the bottom of the cavity of the build tray retaining the photosensitive liquid in various of the Accused Printers).

144. The substrate assembly also includes a second layer disposed below the first layer.




*See* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the glass plate positioned beneath the build tray, which functions as the second layer supporting the film).

Ultra User Guide

1. The model under construction is positioned above the material of photopolymer. The material bottom is made from a flexible transparent Teflon film which is supported by a glass plate.



*See, e.g.*, Ex. 13 (Ultra User Guide) at 8 (describing how the bottom of the photopolymer reservoir is made from transparent Teflon film and is supported by a glass plate); Ex. 17 (Max

2 User Guide) (same), Ex. 18 (Max X Plus User Guide) (same), Ex. 21 (PRO 4K User Guide) (same).

145. The substrate assembly further includes a third layer comprising a transparent permeable substrate disposed between the first and second layers, permitting transmission of curing light, such as the diffusing film in the UltraGLOSS and similar resin trays.




Ex. 44 at 1 (https://support.asiga.com/pro-4k-trays-have-little-holes-in-the-corners/), Ex. 23 (https://support.asiga.com/build-tray-types/) (showing that "PRO 4K trays are specifically engineered with multiple layers of film," which necessarily includes the UltraGLOSS build trays that are compatible with all of the Accused Printers).




Asiga LIFT™ explainer




Asiga LIFT™ explainer




Asiga LIFT™ explainer

*See* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the build tray of the Accused Products including the third, semi-transparent diffusing film independent of the first Teflon film layer).




UltraGLOSS™ by Asiga

*See* https://www.youtube.com/watch?v=jfqnv5-wUOk (showing promotional material by Asiga indicating that the UltraGLOSS build tray is adapted to enhance the surface finish of the 3D-printed object printed using the Accused Printers).

146. Asiga's infringement of the '555 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

147. Asiga's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

148. Despite its knowledge of the '555 Patent and at least since service of this Complaint, Asiga has continued its infringing conduct with knowledge that its Accused Products infringe the '555 Patent.

149. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's direct infringement of the '555 Patent.

## COUNT X
**(Indirect Infringement of the '555 Patent)**

150. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

151. As set forth above, at least upon service of this Complaint, Asiga has knowledge of the '555 Patent and of its infringement thereof.

152. After acquiring knowledge of the '555 Patent, Asiga has actively, knowingly, and intentionally induced infringement of the '555 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to make and use the Accused Products in a manner that embodies each element of at least Claim 1 of the '555.

153. Asiga's inducement includes providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and

online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products, which necessarily infringes for the reasons discussed above. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

154. After having acquired knowledge of the '555 Patent, Asiga has also contributorily infringed the '555 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '555 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Asiga sells and distributes resin tray assemblies such as Asiga's UltraGLOSS and Endurance resin trays, components that form part of the assemblies

and systems claimed in the Asserted Patents specifically for use with Asiga printers. Ex. 23 (https://support.asiga.com/build-tray-types/) at 3 (showing Asiga's UltraGLOSS resin tray); *id.* at 3-4 (showing Asiga's Endurance resin tray). Further, the Accused Products use photopolymer resin material to be solidified in the building region, which Asiga supplies. The photopolymer resin material used in the Accused Products includes a binder component and fillers that affect curing behavior, optical response, and material properties, as reflected in Asiga's resin library. *See e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/).

155. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Asiga has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '555 Patent and are not staple articles suitable for substantial non-infringing use.

156. Asiga has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '555 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '555 Patent, by advertising and promoting the use

of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

157. Asiga's indirect infringement of the '555 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

158. Asiga's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

159. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's indirect infringement.

**COUNT XI**
**(Direct Infringement of the ’260 Patent)**

160. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

161. Asiga has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the ’260 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

162. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the ’260 Patent. Claim 1 recites the following limitations:

> A device for producing a three-dimensional object from a solidifiable material, comprising:
>
> an image forming unit comprising a number of image forming elements arranged in a two-dimensional matrix, wherein during an object building operation,
>
> each image forming element projects a first solidification energy onto a surface of the solidifiable material, thereby projecting a first set of pixels on the surface of the solidifiable material, the first set of pixels defining an image pattern at a first position and each pixel in the first set of pixels corresponding to one of the image forming elements, and
>
> each image forming element projects a second solidification energy onto the surface of the solidifiable material, thereby projecting a second set of pixels on the surface of the solidifiable material, the second set of pixels defining the image pattern at a second position shifted relative to the first position, and each pixel in the second set of pixels corresponding to one of the image forming elements.

163. The Accused Products are 3D printers for producing three-dimensional objects from solidifiable materials, including resin. They include an image forming unit comprising a DLP light engine equipped with a DLP imaging chip having a 1920x1080 micromirror pixel array, which is a two-dimensional matrix of image forming elements.

164. The Accused Products employ a pixel-shifting mechanism that spatially shifts projected images during printing in order to increase effective resolution by projecting a series of solidification energies via the image forming unit during object formation. During a layer exposure, the DLP imaging chip projects a first image pattern onto the solidifiable material, thereby projecting a first set of pixels at a first position on the material surface, each pixel corresponding to an image-forming element of the DLP imaging chip. During operation, the projected image is spatially shifted at high frequency by a piezoelectric mechanism to produce an effective 3840 × 2160 pixel image from the native array. Following the spatial shift, the DLP imaging chip projects a second set of pixels defining the image pattern at a second position shifted relative to the first position. Thus, the image-forming elements project image pixels at multiple spatially offset positions during formation of a layer.

**Native and 4K Resolution**

The Ultra light engine is equipped with a DLP imaging chip having a 1920x1080 pixel array. The projected image can be spatially shifted at high frequency by a piezoelectric mechanism to produce a 3840x2160 pixel image. The effect simulates a 4K resolution image. Operating in this mode produces images and consequently 3D parts having smoother edges and resolution than produced in the native mode. However, the native pixel size is larger than the pixels of the 4K image, which means that some control is lost over the rendering process at the edges of the image contours. For this reason, the user has the option to switch off the piezoelectric mechanism and operate the light engine in native resolution mode, producing a 2712-by-1528 image. Note that the native resolution image does not use all the pixels present on the DLP chip.

Copyright ASIGA © 01/01/24 9 / 67 VERSION 1.01 (2024-01-01)

**_Native and 4K Resolution_**

The PRO 4K light engine is equipped with a DLP imaging chip having a 2716-by-1528 pixel array. The projected image can be spatially shifted at high frequency by a piezoelectric mechanism to produce a 3840-by-2160 pixel image. The effect simulates a 4K resolution image. Operating in this mode produces images and consequently 3D parts having smoother edges and resolution than produced in the native mode. However, the native pixel size is larger than the pixels of the 4K image, which means that some control is lost over the rendering process at the edges of the image contours. For this reason, the user has the option to switch off the piezoelectric mechanism and operate the light engine in native resolution mode, producing a 2712-by-1528 image. Note that the native resolution image does not use all the pixels present on the DLP chip.

The Settings menu has a 4K Mode toggle. If the toggle is turned on, the projector operates in 4K mode. If the toggle is off, the projector operates in Native Mode.

Copyright ASIGA © 21/5/25 12 / 71 VERSION 1.04 (2024-08-13)

*See, e.g.*, Ex. 13 (Ultra User Guide) at 9 (showing how the Accused Products can spatially shift the projected image to achieve 4K resolution from a non-4K native resolution), Ex. 21 (PRO 4K User Guide) at 12 (same).

165. Asiga's infringement of the process and device claims of the '260 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

166. Asiga's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

167. Despite its knowledge of '260 Patent and at least since service of this Complaint, Asiga has continued its infringing conduct with knowledge that its Accused Products infringe the '260 Patent.

168. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's direct infringement of the '260 Patent.

## COUNT XII
**(Indirect Infringement of the ’260 Patent)**

169. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

170. As set forth above, at least upon service of this Complaint, Asiga has knowledge of the ’260 Patent and of its infringement thereof.

171. After acquiring knowledge of the ’260 Patent, Asiga has actively, knowingly, and intentionally induced infringement of the ’260 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to make and use the Accused Products in a manner that embodies each element of at least Claim 1 of the ’260 Patent.

172. Asiga’s inducement includes providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products, which necessarily infringes for the reasons discussed above. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product’s features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing

manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

173. After having acquired knowledge of the ’260 Patent, Asiga has also contributorily infringed the ’260 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the ’260 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Asiga sells and distributes resin tray assemblies such as Asiga’s UltraGLOSS and Endurance resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Asiga printers. Ex. 23 (https://support.asiga.com/build-tray-types/) at 3 (showing Asiga’s UltraGLOSS resin tray); *id.* at 3-4 (showing Asiga’s Endurance resin tray). Further, the Accused Products use photopolymer resin material to be solidified in the building region, which Asiga supplies. The photopolymer resin material used in the Accused Products includes a binder component and fillers that affect curing behavior, optical response, and material properties, as reflected in Asiga’s resin library. *See e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/).

174. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the

apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1 or the process claims of the ‘260 Patent, and the Accused Products have no purpose other than to 3D print. Thus, Asiga has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the ’260 Patent and are not staple articles suitable for substantial non-infringing use.

175. Asiga has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the ’260 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the ’260 Patent, by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product’s features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-

changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

176. Asiga's indirect infringement of the '260 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

177. Asiga's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

178. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's indirect infringement.

**COUNT XIII**
**(Direct Infringement of the '588 Patent)**

179. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

180. Asiga has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '588 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

181. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '588 Patent. Claim 1 recites the following limitations:

> A substrate assembly for use with a three-dimensional printer reservoir, the reservoir including a frame defining a cavity adapted to be at least partially filled with a photosensitive liquid, the substrate assembly comprising:

a first layer comprising a film adapted to be configured with a lower portion of the cavity and to hold the photosensitive liquid within the cavity above a projection lens of a stereolithography projector configured below the film;

a second layer configured below the first layer; and

a third layer comprising a semi-transparent substrate adapted to enhance a surface finish of a 3D-printed object held detachedly between the first layer and the second layer.

182. The Accused Products include, without limitation, the Accused Printers used with the UltraGLOSS trays, each of which includes a resin tank or reservoir assembly comprising a frame that defines a cavity adapted to be at least partially filled with photosensitive resin during printing. *See* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing liquid photopolymer resin being poured into the cavity of a resin tank of a build tray).

183. The Accused Products further include a first layer comprising a film positioned at a lower portion of the reservoir cavity that retains the photosensitive liquid, including a permeable film that holds the resin within the cavity while permitting exposure to light from a projection system positioned below the film. https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the Teflon film layer at the bottom of the cavity of the build tray which retains the photosensitive liquid); *see* https://www.youtube.com/watch?v=jRBbtgkT70g (showing that the teflon film layer is the layer that contacts the photosensitive material indicating that it is the layer that holds the photosensitive material within the build tray); *see also* https://www.youtube.com/watch?v=NNraRSVHI4Y, https://www.youtube.com/watch?v=F-y1WpwtJg8, and https://www.youtube.com/watch?v=nyfT-SRwKu8 (showing the film layer at the bottom of the cavity of the build tray retaining the photosensitive liquid in various of the Accused Printers).




The Asiga Ultra




The Asiga PRO 4K




**Asiga Max 2**

*See, e.g.*, https://www.youtube.com/watch?v=NNraRSVHI4Y, https://www.youtube.com/watch?v=F-y1WpwtJg8, https://www.youtube.com/watch?v=nyfT-SRwKu8 (showing that the first layer is positioned above a projection lens of a stereolithography projector in the Accused Printers).

184. The Accused Products also include a second layer configured below the first layer, including a substrate positioned beneath the film, such as a glass or similar support structure forming part of the printing assembly. *See* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the glass plate positioned beneath the build tray, which is the second layer supporting the film and forming part of the printing assembly); Ex. 13 (Ultra User Guide) at 8 (describing how the bottom of the photopolymer reservoir is made from transparent Teflon film and is supported by a glass plate); Ex. 17 (Max 2 User Guide) (same), Ex. 18 (Max X Plus User Guide) (same), Ex. 21 (PRO 4K User Guide) (same).

185. The Accused Products further include a third, semi-transparent layer configured to diffuse light and enhance surface finish, such as the diffusing film used in UltraGLOSS and similar resin trays. Ex. 44 at 1 (https://support.asiga.com/pro-4k-trays-have-little-holes-in-the-corners/), Ex. 23 (https://support.asiga.com/build-tray-types/) (showing that "PRO 4K trays are specifically engineered with multiple layers of film," which necessarily include the UltraGLOSS build trays that are compatible with all of the Accused Printers); *see* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the build tray of the Accused Products including the third, semi-transparent diffusing film independent of the first Teflon film layer); https://www.youtube.com/watch?v=jfqnv5-wUOk (showing promotional material by Asiga indicating that the UltraGLOSS build tray is adapted to enhance the surface finish of the 3D-printed object printed using the Accused Printers).

186. Asiga's infringement of the '588 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

187. Asiga's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

188. Despite its knowledge of the '588 Patent and at least since service of this Complaint, Asiga has continued its infringing conduct with knowledge that its Accused Products infringe the '588 Patent.

189. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's direct infringement of the '588 Patent.

**COUNT XIV**
**(Indirect Infringement of the ’588 Patent)**

190. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

191. As set forth above, at least upon service of this Complaint, Asiga has knowledge of the ’588 Patent and of its infringement thereof.

192. After acquiring knowledge of the ’588 Patent, Asiga has actively, knowingly, and intentionally induced infringement of the ’588 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to make and use the Accused Products in a manner that embodies each element of at least Claim 1 of the ’588 Patent.

193. Asiga’s inducement includes providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products, which necessarily infringes for the reasons discussed above. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product’s features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing

manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

194. After having acquired knowledge of the ’588 Patent, Asiga has also contributorily infringed the ’588 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the ’588 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Asiga sells and distributes resin tray assemblies such as Asiga’s UltraGLOSS and Endurance resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Asiga printers. Ex. 23 (https://support.asiga.com/build-tray-types/) at 3 (showing Asiga’s UltraGLOSS resin tray); *id.* at 3-4 (showing Asiga’s Endurance resin tray). Further, the Accused Products use photopolymer resin material to be solidified in the building region, which Asiga supplies. The photopolymer resin material used in the Accused Products includes a binder component and fillers that affect curing behavior, optical response, and material properties, as reflected in Asiga’s resin library. *See e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/).

195. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the

apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Asiga has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '588 Patent and are not staple articles suitable for substantial non-infringing use.

196. Asiga has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '588 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '588 Patent, by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-

changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

197. Asiga's indirect infringement of the '588 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

198. Asiga's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

199. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's indirect infringement.

**COUNT XV**
**(Direct Infringement of the '180 Patent)**

200. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

201. Asiga has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '180 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

202. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '180 Patent. Claim 1 recites the following limitations:

> A reservoir assembly for use with a three-dimensional (3D) printer for printing a 3D object, comprising:
>
> > a frame defining a cavity adapted to be at least partially filled with a photosensitive liquid;

> a first layer comprising a film adapted to be configured with a lower portion of the cavity to hold the photosensitive liquid within the cavity, and adapted to align with a second layer configured below the first layer, the second layer optionally external to or integral with the reservoir assembly; and
>
> a third layer comprising a semi-transparent substrate adapted to enhance a surface finish of a 3D-printed object held without an adhesive between the first layer and the second layer.

203. The Accused Products include, without limitation, the Accused Printers used with the UltraGLOSS trays, each of which includes a reservoir assembly in which a resin tank defines a cavity configured to hold liquid photopolymer resin during printing. *See* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing liquid photopolymer resin being poured into the cavity of a resin tank of a build tray).

204. The Accused Products further include a first layer comprising a film positioned to form a lower portion of the cavity and to retain the photosensitive liquid, such as the permeable film used in the resin tank. https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the Teflon film layer at the bottom of the cavity of the build tray which retains the photosensitive liquid); *see* https://www.youtube.com/watch?v=jRBbtgkT70g (showing that the teflon film layer is the layer that contacts the photosensitive material indicating that it is the layer that holds the photosensitive material in within the build tray); https://www.youtube.com/watch?v=NNraRSVHI4Y, https://www.youtube.com/watch?v=F-y1WpwtJg8, and https://www.youtube.com/watch?v=nyfT-SRwKu8 (showing the film layer at the bottom of the cavity of the build tray retaining the photosensitive liquid in various of the Accused Printers).

205. The Accused Products also include a second layer configured below the first layer, including a substrate or support structure positioned beneath the film. *See*

https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the glass plate positioned beneath the build tray, which functions as the second layer supporting the film); Ex. 13 (Ultra User Guide) at 8 (describing how the bottom of the photopolymer reservoir is made from transparent Teflon film and is supported by a glass plate); Ex. 17 (Max 2 User Guide) (same), Ex. 18 (Max X Plus User Guide) (same), Ex. 21 (PRO 4K User Guide) (same).

206. In addition, the Accused Products include a third layer comprising a semi-transparent substrate disposed between the first and second layers configured to diffuse light and enhance the surface finish of printed objects, such as the diffusing film used in UltraGLOSS and similar resin trays. Ex. 44 at 1 (https://support.asiga.com/pro-4k-trays-have-little-holes-in-the-corners/), Ex. 23 (https://support.asiga.com/build-tray-types/) (showing that "PRO 4K trays are specifically engineered with multiple layers of film," which necessarily includes the UltraGLOSS build trays that are compatible with all of the Accused Printers); *see* https://www.youtube.com/watch?v=NNraRSVHI4Y (showing the build tray of the Accused Products including the third, semi-transparent diffusing film independent of the first Teflon film layer); https://www.youtube.com/watch?v=jfqnv5-wUOk (showing promotional material by Asiga indicating that the UltraGLOSS build tray is adapted to enhance the surface finish of the 3D-printed object printed using the Accused Printers).

207. Asiga's infringement of the '180 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

208. Asiga's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

209. Despite its knowledge of the ’180 Patent and at least since service of this Complaint, Asiga has continued its infringing conduct with knowledge that its Accused Products infringe the ’180 Patent.

210. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga’s direct infringement of the ’180 Patent.

**COUNT XVI**
**(Indirect Infringement of the ’180 Patent)**

211. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

212. As set forth above, at least upon service of this Complaint, Asiga has knowledge of the ’180 Patent and of its infringement thereof.

213. After acquiring knowledge of the ’180 Patent, Asiga has actively, knowingly, and intentionally induced infringement of the ’180 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to make and use the Accused Products in a manner that embodies each element of at least Claim 1 of the ’180 Patent.

214. Asiga’s inducement includes providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products, which necessarily infringes for the reasons discussed above. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38

(https://support.asiga.com/max-x/) (same); Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

215. After having acquired knowledge of the '180 Patent, Asiga has also contributorily infringed the '180 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '180 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Asiga sells and distributes resin tray assemblies such as Asiga's UltraGLOSS and Endurance resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Asiga printers. Ex. 23 (https://support.asiga.com/build-tray-types/) at 3 (showing Asiga's UltraGLOSS resin tray); *id.* at 3-4 (showing Asiga's Endurance resin tray). Further, the Accused Products use photopolymer resin material to be solidified in the building region, which Asiga supplies. The photopolymer resin material used in the Accused Products includes a binder component and

fillers that affect curing behavior, optical response, and material properties, as reflected in Asiga's resin library. *See e.g.*, Ex. 30 (https://www.asiga.com/materials-dental/).

216. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Asiga has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '180 Patent and are not staple articles suitable for substantial non-infringing use.

217. Asiga has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '180 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '180 Patent, by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner. *See., e.g.*, Ex. 36 (https://support.asiga.com/ultra/) (directing customers to safety and user manuals, set-up guides, how-to-use guides, troubleshooting tips, and additional resources); Ex. 37 (https://support.asiga.com/max-2/) (same); Ex. 38 (https://support.asiga.com/max-x/) (same);

Ex. 39 (https://support.asiga.com/pro-4k/) (same); Ex. 40 (https://support.asiga.com/pro-4k-xl/) (same); https://www.youtube.com/watch?v=NNraRSVHI4Y (public video provided by Asiga promoting the Accused Product's features, demonstrating its functionality, and showing how to use it); https://www.youtube.com/watch?v=3VsqB1uCN3A (showing an online video providing step-by-step instructions on how to use the Accused Products in an infringing manner); Ex. 41 (https://www.asiga.com/the-3d-printed-prototype-a-restorative-game-changer/) at 3-4 (encouraging, promoting, and instructing customers to use the Accused Products in connection with 3D printing operations); https://vimeo.com/873591254?fl=pl&fe=ti (promoting a workflow to print a 3D object using an Asiga printer and UltraGLOSS build tray).

218. Asiga's indirect infringement of the '180 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

219. Asiga's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

220. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Asiga's indirect infringement.

## PRAYER FOR RELIEF

WHEREFORE, SprintRay prays for judgment and relief as follows:

A. An entry of judgment holding that Asiga has infringed and is infringing each of the Asserted Patents;

B. An entry of judgment holding that Asiga has induced infringement and is inducing infringement of each of the Asserted Patents;

C. An entry of judgment holding that Asiga has contributorily infringed and is contributorily infringing each of the Asserted Patents;

D. A preliminary and permanent injunction against Asiga and its officers, employees, agents, servants, attorneys, instrumentalities, and those in privity with them, from infringing, inducing, and contributing to the infringement of each of the Asserted Patents and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

E. An award to SprintRay of such damages as it shall prove at trial against Asiga to compensate SprintRay for Asiga's infringement of each of the Asserted Patents that will account for infringement up to trial based on the relevant information and financials produced, where said damages will be no less than a reasonable royalty;

F. An entry of judgement holding that Asiga's infringement of each of the Asserted Patents has been willful and deliberate, at least from the filing of this Complaint;

G. A finding that this case is "exceptional" and an award to SprintRay of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

H. An accounting of all infringing sales and revenues, together with post judgment interest and prejudgment interest from the first date of infringement of each of the Asserted Patents; and

I. Such further and other relief as the Court may deem proper and just.

**JURY DEMAND**

SprintRay demands a jury trial on all issues so triable.

POTTER ANDERSON & CORROON LLP

By: /s/ *Philip A. Rovner*
Philip A. Rovner (#3215)
Nicole K. Pedi (#6236)
Hercules Plaza
1313 North Market Street, 7th Floor
P.O. Box 951
Wilmington, Delaware 19801
Tel.: (302) 984-6000
provner@potteranderson.com
npedi@potteranderson.com

*Attorneys for Plaintiff SprintRay, Inc.*

OF COUNSEL:

Lisa Kobialka (*pro hac vice* to be filed)
Christina M. Finn (*pro hac vice* to be filed)
Brown Rudnick LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel.: (669) 469-1800

Aaron M. Frankel (*pro hac vice* to be filed)
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Tel.: (212) 209-4800

Dated: October 23, 2026